IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

RAYL LYNN KELLAR,

      Plaintiff,

v.                                                             CASE NO. 4:14-cv-84-RH-GRJ

FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

      Defendants.

_____/

## REPORT AND RECOMMENDATION

      This matter is before the Court on ECF No. 105, Defendants' Motion

for Summary Judgment. Plaintiff has filed a response in opposition. (ECF

No. 115.) The motion for summary judgment is, therefore, ripe for review.

For the reasons discussed below, Defendants' motion for summary

judgment should be granted.

## I.  BACKGROUND

      Plaintiff initiated this case on by filing a *pro se* complaint in the Circuit

Court of the Second Judicial Circuit, in and for Leon County, Florida,

asserting claims against five defendants. (ECF No. 1.)  Defendants R.

Wolf, Florida Department of Corrections ("FDOC"), and Florida Correctional

Medical Authority filed a notice of removal under 28 U.S.C. § 1441. (*Id.*)
Following dismissal of several claims, the Court directed Plaintiff to file an
amended complaint. (ECF No. 58.)

Plaintiff filed his amended complaint on April 30. 2015, naming Julie
Jones, Secretary of the FDOC, C.T. West, Jr., R. Wolf, and L. Carrero as
Defendants. (ECF No. 62.) Plaintiff alleges that Defendants were
deliberately indifferent to his serious medical needs in violation of the
Eighth Amendment. (*Id.*) He also claims Defendants were negligent toward
his medical needs. (*Id.*) As relief, he requests compensatory and punitive
damages, as well as injunctive relief for proper medical care. (*Id.*)

Defendants filed a motion to dismiss Plaintiff's amended complaint
on June 21, 2015. (ECF No. 70.) The Court subsequently denied
Defendants' motion to dismiss. (ECF No. 88.) Defendants then filed the
instant motion for summary judgment. (ECF No. 105.)

Defendants argue that the undisputed evidence demonstrates they
are entitled to summary judgment under Fed. R. Civ. P. 56(b). In support of
their argument Defendants have filed the following evidence: (1) Dr.
Maier's sworn declaration (ECF No. 105-2 ("Maier Dec.")); (2) Excerpts of
Plaintiff's medical records (ECF No. 105-8 ("Exc. MR")); (3) Excerpts of

Plaintiff's deposition ("ECF No. 105-3 ("Pl. Depo.")); (4) Plaintiff's formal

grievance (ECF No. 105-4 ("Griev.")); (5) Defendant Dr. Carrero's sworn

declaration (ECF No. 105-5 ("Carrero Dec.")); (6) Defendant Connice

West's sworn declaration (ECF No. 105-6 ("West Dec.")); (7) Defendant

Roberta Wolf's sworn declaration (ECF No. 105-7 ("Wolf Dec.")); and (8)

Plaintiff's medical records ("ECF No. 108 ("MR")).

Under Fed. R. Civ. P. 56(e),

[i]f a party fails to properly support an assertion of fact or fails
to properly address another party's assertion of fact as required
by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting
materials—including the facts considered undisputed—show
that the movant is entitled to it; or

(4) issue any other appropriate order.

In this case, Plaintiff has not submitted any sworn affidavits or other

evidence in support of his claim (other than the exhibits attached to his

complaint) or in opposition to summary judgment.[1]

---

[1] There is not question that Plaintiff understood he was required to submit
evidence in opposition to the motion for summary judgment. *See* ECF No. 115 (replying
to Defendants' motion for summary judgment and asserting that "[a]bsent discovery
extension to permit the records custodian to testify at deposition as to the contents of
plaintiff's medical records, plaintiff's position is untenable. Likewise, without an
extended discovery period, plaintiff is unable to obtain necessary and relevant affidavits

Although Plaintiff did not submit any sworn affidavits, Plaintiff's complaint is signed under penalty of perjury. (ECF No. 62.) Thus, the complaint is properly treated by the Court like a sworn affidavit. *See Sammons v. Taylor*, 967 F.2d 1533, 1545 n.5 (11th Cir. 1992) ("[T]his Court has recognized that facts alleged in an inmate's sworn pleading are sufficient [to defeat a properly supported motion for summary judgment] and that a separate affidavit is not necessary."); *cf. Henderson v. Cherry*, No. 5:08cv283/RS/EMT,  2010 WL 1257487, at *1 n.2 (N.D. Fla. Mar. 16, 2010) (declining to consider plaintiff's response to defendant's motion for summary judgment as evidence because the response was not made under penalty of perjury).  Accordingly, Plaintiff's sworn allegations in his complaint may be considered in ruling on the motion for summary judgment.

## II.  EVIDENCE

Plaintiff injured his ankles and right knee in 2006 by falling from a bunk at Columbia Correctional Institution ("Columbia CI"). (ECF No. 62, ¶ 15 ("Compl.").) Plaintiff was sent to the medical clinic where x-rays were

---

and declarations from other prisoners to support the visits to the medical clinic seeking information as to surgery"). To the extent Plaintiff asserts he was "deprived of a proper discovery period to obtain relevant and material evidence to support his claims" because the Court denied his motion for extension of the discovery period, the Court denied Plaintiff's request because he offered no reason for the Court to extend the discovery period. *See* ECF No. 101.

taken of his left ankle due to discoloration and swelling, but not of his right ankle or knee. (*Id.*) He was given ambulatory assistance and medication for pain. (*Id.*)

Plaintiff was subsequently transferred to Cross City Correctional Institution ("Cross City CI"). (*Id.* ¶ 16.) From 2007 through 2010, Plaintiff went to sick call on multiple occasions complaining of pain in his right knee. (*Id.*) Various nurses and doctors examined Plaintiff but none ordered x-rays. (*Id.*) Although his knee also collapsed on several occasions, the doctors simply said it was because of old age and would just get worse with age. (*Id.* ¶ 17.)

In 2010, Dr. Carrero replaced the medical doctor at Cross City CI. (*Id.* ¶ 18.) Plaintiff presented to medical on April 12, 2010, for a fracture/sprain assessment. (MR at 48.) Plaintiff reported that he suffered a twisting injury to his right knee two years ago, which still causes problems squatting and climbing stairs. (*Id.*) Examination revealed pain but no swelling, and instability with squats and climbing stairs. (*Id.*) The nurse instructed Plaintiff to take ibuprofen and referred Plaintiff to Dr. Carrero. (MR 48, 80.) Following examination, Dr. Carrero ordered an x-ray of Plaintiff's right knee. (MR 47–48, 80; Compl. ¶ 19.) The x-ray, which was performed the following day, showed no evidence of fracture, bony tumor,

or other abnormalities. (*Id.* at 79; Compl. ¶ 20.) Nonetheless, on April 21, 2010, Dr. Carrero ordered an MRI of Plaintiff's right knee and prescribed Plaintiff an 8-week prescription of Naprosyn. (MR at 56, 78.)

Plaintiff was transferred to the FDOC Reception and Medical Center ("RMC"), where the MRI was performed on May 4, 2010. (MR at 75–77.) The MRI revealed (1) a "large complex meniscal tear posterior horn of the medial meniscus," with "associated cartilanginous injury with no evidence of a cartilanginous flap," and (2) "chondromalacia patella." (MR at 75.) Dr. Carrero reviewed the MRI results with Plaintiff at his follow-up on May 7, 2010. (MR at 46.) That same day, Dr. Carrero submitted a routine consultation request for Plaintiff to be evaluated by an orthopedist. (MR at 46, 67.) The appointment was scheduled for May 18, 2010. (MR at 67.)

At his orthopedic appointment on May 18, 2010, Carlos Esquivia, MD, determined that Plaintiff needed a video arthroscopy of his right knee and a partial right medial meniscectomy. (*Id.* at 45, 68) Dr. Esquivia's medical note indicated "urgent." (*Id.*) Dr. Esquivia did not, however, mention what would happen if Plaintiff did not have the surgery. (Pl. Depo at 7, ln. 19–21.) In the meantime, Dr. Esquivia prescribed Naprosyn for pain. (MR at 68, 55.) Plaintiff then returned to Cross City CI. (MR at 45.) Based on Dr. Esquivia's evaluation, Dr. Carrero submitted a surgery

request for Plaintiff on May 21, 2010. (MR at 45, 66.) Of the three options on the surgery request form—routine, urgent, and emergent—Dr. Carrero checked "urgent." (MR at 66.)

According to Albert Carl Maier, Senior Physician for the FDOC in the Central Office, "[m]eniscal knee injuries are not a medical or surgical emergency and can be handled conservatively without immediate surgical intervention." (Maier Dec. ¶¶ 1, 3.)

> Generally, tears are caused by acute trauma or wear and tear during the aging process. A tear of such a structure will initiate swelling and pain, affecting the patient's weight bearing ability. While tears can be treated by endoscopic repair, immediate surgery is not a requirement and when the condition is chronic, the condition can be treated with medication and assisted walking devices to maintain the patient ambulatory.

(*Id.* ¶ 3.)

At some point after Dr. Carrero submitted the surgery request, Plaintiff arranged for an attorney visit on June 24, 2010. (Compl. ¶ 21.) The scheduled visit—unrelated to Plaintiff's medical concerns—cost Plaintiff $500 as a non-refundable advance for expenses. (*Id.*; Pl. Depo at 8, ln. 15–23.) On June 23, 2010 Plaintiff was transferred to Lake Butler for surgery scheduled for June 25, 2010. (*Id.* ¶ 22; MR at 4.) Upon arrival, Plaintiff explained to the nurse that he had a scheduled legal visit in conflict with the transfer. (Compl. ¶ 22.) The nurse advised Plaintiff to sign a

medical refusal, which she said would also reschedule Plaintiff's surgery. (*Id.*) Plaintiff signed the refusal that day and returned to Cross City CI. (MR at 4, 44; Pl. Depo at 9, ln. 10–16.)

By August 2010, however, Plaintiff still had not received surgery. (Compl. ¶ 24.) Plaintiff says he returned to sick call and the nurse told him that Dr. Carrero told her she was upset because Plaintiff refused the surgery, that he was wasting their time, and that if he still wanted surgery he would have to start the whole procedure over. (*Id.*; Pl. Depo. at 14, ln. 9–25.) Dr. Carrero asserts, however, that she did not deliberately delay rescheduling Plaintiff's surgery to punish him for refusing his scheduled knee surgery. (Carrero Dec. at 1.) After Plaintiff returned to Cross City CI, Dr. Carrero reviewed Plaintiff's surgery refusal and evaluated his chart for any serious risk to his health, but found none. (*Id.*)

According to FDOC policy, when a patient refuses an elective surgery, such as for meniscus knee surgery, the original order is cancelled. (*Id.*; Maier Dec. ¶ 5.) If the patient wishes to reschedule the surgery, the patient must reinitiate the sick call procedure to get a consult for a visit with the specialist and an order from the specialist for the surgery. (*Id.*) Cross City CI's policy was that an inmate must go to sick call three times before the inmate sees the doctor. (Compl. ¶ 24; Pl. Depo. at 11, ln. 1–9.)

Plaintiff says he complied and reinitiated the sick call procedure. (Compl. ¶ 25.) While waiting for the surgery to be rescheduled, his knee was not a problem for a while, but the more he walked it became inflamed and eventually caused him to fall down. (Pl. Depo. at 11, ln. 13–19.) He believes that falling caused additional damage to his knee. (*Id.*, ln. 16–25.) Despite Plaintiff's claim he was able to carry on his normal daily activities other than sports. (*Id.* at 20, ln. 20–25.)

At Plaintiff's periodic medical screening on September 8, 2010, Plaintiff brought up his ongoing right knee problem. (MR at 82.) Plaintiff requested to be reconsidered for surgery, stating "I am not getting out, so may I be considered for surgery?" (*Id.*) The nurse spoke with Dr. Carrero that day about Plaintiff's request for rescheduled surgery. (*Id.* at 84.) Dr. Carrero advised that Plaintiff was to return to sick call for re-assessment of his right knee issues. (*Id.*) The dorm was notified the following day to send Plaintiff to medical. (*Id.*)

Plaintiff reported to sick call on September 9, 2010 as instructed. (MR at 42.) Examination revealed mild swelling and pain, which Plaintiff rated an eight out of ten. (*Id.*) The nurse instructed Plaintiff to splint the joint above and below the suspected area, elevate his leg and apply ice, and continue to recheck his distal pulse. (*Id.*) The nurse also gave Plaintiff

a knee brace to use, as well as ibuprofen and A-balm for pain. (*Id.*) Plaintiff

returned to sick call five days later because his knee still hurt. (MR at 41,

87) The nurse instructed Plaintiff to continue wearing his knee brace and

take ibuprofen for pain, which was available in the dorm upon request. (*Id.*;

Maier Dec. ¶ 16.) The nurse also continued Plaintiff's restricted activity

pass. (MR at 41, 87.)

Plaintiff again inquired about his knee surgery on September 22,

2010. (MR at 40, 85.) The nurse noted that he already had an appointment

scheduled with Dr. Carrero. (MR at 40.) Plaintiff saw Dr. Carrero the

following day for evaluation. (MR at 40, 49.) Plaintiff reported that his right

knee still hurt and examination revealed that his knee was tight and

swollen. (MR at 49.) Dr. Carrero completed a routine orthopedic

consultation request for Plaintiff on September 30, 2010. (MR at 40, 64,

89.) Plaintiff signed the request form on October 1, 2010, authorizing

specialty evaluation by the orthopedist. (*Id.*) The orthopedist appointment

was scheduled for November 2, 2010. (*Id.*)

Plaintiff says, however, Dr. Carrero refused to reissue pain and

inflammation medication she previously prescribed even though Plaintiff

still had pain and his condition remained unchanged. (Compl. ¶ 25.) Dr.

Carrero disputes this assertion, stating that if Plaintiff had requested a sick

call for pain medication, she would have evaluated him for the need and prescribed the necessary medication. (Carrero Dec. at 2.) Additionally, Plaintiff later admitted at his deposition that he received pain medication from the time that he got to Cross City CI, including ibuprofen and Naproxen. (Pl. Depo. at 6, ln. 4–21.) Ibuprofen and Naproxen are similar and are both used to treat inflammation. (Maier Dec. ¶ 16.)[2]

On October 12, 2010, Plaintiff filed a formal grievance because he had yet to receive surgery or pain and inflammation medication. (Griev. at 2; Compl. ¶ 26.) The November 2, 2010 response to Plaintiff's grievance stated the following: "I have read your request for administrative remedy and have carefully reviewed your medical record. Proper procedure for rescheduling the recommended surgery was followed. Nothing in your record reflects that you were denied any care or that treatment was rendered improperly. Request for administrative remedy denied." (Griev. at 1.) The response was signed by Defendant West, Dr. Carrero, and S. Hackbarth, Senior RN Supervisor at Cross City CI. (*Id.*)

Plaintiff says Defendant West ignored policy, personally reviewed Plaintiff's medical records, and determined that Plaintiff was receiving

---

[2] Naproxen and Naprosyn are the same anti-inflammatory drugs. *Naprosyn*, Drugs.com, https://www.drugs.com/naprosyn.html.

proper medical care. (Compl. ¶ 27.) At the time, Defendant West was
Assistant Warden of Programs at Cross City CI. (West Dec. ¶ 3.) His
responsibility with regard to medical grievances was to ensure the proper
routing and filing of the grievances and responses. (*Id.*) An inmate
grievance of a medical nature is routed to the Medical Department for a
response from the Chief Medical Officer. (*Id.* ¶¶ 3–4; Compl. ¶ 27.) The
response is then distributed to the inmate and the FDOC's record keeping
system. (West Dec. ¶ 3.) Defendant West was not authorized to review
inmate medical records and would not have personally responded to any
medical grievances filed by inmates, including Plaintiff. (*Id.* ¶ 4.) Defendant
West's signature on the grievance response merely indicates that the
response crossed his desk so he could fulfill his routing and filing duties.
(*Id.*) In addition, independent of the grievance system, an inmate can
complete a sick call slip and submit it directly to the Medical Department if
the inmate feels his surgery is not being properly rescheduled. (*Id.* ¶ 5.)

Meanwhile, Dr. Esquivia re-evaluated Plaintiff in the orthopaedic
clinic at RMC on November 2, 2010 as scheduled. (MR at 39, 65.) Dr.
Esquivia again found that Plaintiff needed video arthroscopy of his right
knee joint and partial right medial meniscectomy. (*Id.*) Dr. Carrero reviewed
Dr. Esquiva's renewed request the following day and submitted a routine

request for prior approval of health care services for the arthroscopy. (MR at 6, 39.)

Plaintiff was transferred back to RMC on December 16, 2010, for surgery scheduled for December 20, 2010. (MR at 38.) Before the surgery, however, Raquel Skidmore, M.D., Senior Physician at RMC, identified that Plaintiff had a possible latex allergy. (MR at 33.) Due to the allergy Plaintiff's surgery was cancelled. (*Id.*) Plaintiff was advised he would have to have his surgery scheduled in Jacksonville where there was a latex-free environment. (Pl. Depo. at 21, ln. 10–17.) Plaintiff does not recall being tested for a latex allergy as part of the pre-op procedure. (*Id.*, ln. 21–25.)

Cancelling an elective surgery due to a suspected latex allergy is not uncommon. (Maier Dec. ¶ 17.) Medical professionals check for latex allergies by exposing the patient to a patch treated with a medically prepared solution. (*Id.*) But based on the prevalence of latex in the hospital setting, including gloves and bedding, they may also mistakenly conclude a latex allergy based on an observed skin irritation such as psoriasis, which Plaintiff had. (*Id.*; MR at 81.) An elective surgery is cancelled if there is even a suspected latex allergy. (Maier Dec. ¶ 17.)

Plaintiff was transferred back to Cross City CI on January 24, 2011. (MR at 30–31.) The next day, he filed a formal grievance because his knee

surgery had not been rescheduled within a month and a half after the

cancelled surgery. (Compl. at 6; Wolf Dec. ¶ 4.) According to Dr. Maier:

> [s]cheduling offsite medical appointments is particularly complicated
> and subject to coordination between facilities. In such instances,
> appointments must be made based on the surgeon and facility's
> availability; transportation must be arranged; security must be
> provided to escort the inmate to the appointment and back; and
> priority must be given to inmates according to the nature of their
> medical problems. Generally, it can take three to four months to
> schedule routine surgery.

(Maier Dec. ¶ 15.)

Dr. Carrero reviewed Plaintiff's transfer record on January 26, 2011.

(MR at 30–31.) Dr. Carrero noted that Plaintiff possibly needed a consult

and continued Plaintiff's low bunk, restricted activity, and no sports passes.

(*Id.*) Plaintiff reported to sick call that same day seeking pain medication

and information about his surgery. (MR at 29, 93.) The nurse informed

Plaintiff that his surgery was in the process of being rescheduled. (*Id.*) The

nurse gave Plaintiff ibuprofen and sent Plaintiff's chart to Dr. Carrero for a

Naprosyn prescription. (*Id.*) Dr. Carrero submitted a 90-day prescription for

Naprosyn the following day. (*Id.* at 50, 92.)[3]

On February 15, 2011, Defendant Wolf, Senior Health Services

Administrator ("Senior HSA") at Cross City CI at the time, responded to

---

[3] The Naprosyn prescription was later refilled on April 5, 2011. (*Id.*)

Plaintiff's formal grievance:

> I have read your request for Administrative Remedy and reviewed
> your medical record. Nothing in your record reflects that you have
> been [denied] appropriate medical care. December 17, 2010 you
> were sent to RMC for surgery, however due to you[r] allergy with
> latex it was not completed. You are being rescheduled for this event.
> You may exercise your option to utilize sick call as needed to
> address your pain issues, co-pay will apply. Based on the above
> information, your Request for Administrative Remedy or Appeal is
> denied.

(Compl. at 6; Wolf Dec. ¶¶ 2, 4.) Dr. Carrero and Defendant West also

signed the grievance response. (Compl. at 6.)

As the Senior HSA, one of Defendant Wolf's responsibilities was

responding to institutional grievances related to medical care. (Wolf Dec. ¶

3.) She did not, however, have any control over the scheduling of surgical

procedures, nor were requests for surgery submitted to her for processing.

(*Id.* ¶ 5.) In addition, Defendant Wolf was not a medical professional, nor

was she qualified to make medical decisions regarding inmates' care. (*Id.* ¶

3.) To respond to a grievance, she reviewed the inmate's chart and any

other relevant records and discussed the issue with one of the medical

providers, if necessary. (*Id.*) She would then respond accordingly and the

Chief Health Officer reviewed her response. (*Id.*)

Plaintiff was called to medical on March 7, 2011 to discuss his

cancelled surgery. (MR at 28.) Plaintiff denied having any allergy to

latex—past or present. (*Id.*) Plaintiff allowed the nurse to check his skin with latex gloves. (*Id.*) He returned to the clinic later that afternoon with no sign of rash or allergic reaction from contact with the gloves. (*Id.*) Plaintiff requested to proceed with surgery. (*Id.*)

Plaintiff was transferred back to RMC on March 21, 2011 for surgery. (MR at 25–27.) Plaintiff underwent surgery on his right knee on March 23, 2011. (*Id.*)

Plaintiff had a follow-up visit with Dr. Esquivia on March 29, 2011, at which time Plaintiff reported falling on his right knee four days earlier. (MR at 60–63.) An x-ray taken that same day revealed no definitive evidence of an acute fracture, but the x-ray showed "irregularity of the lateral condyle of the femur, which may represent a non-displaced fracture although somewhat of an unusual location." (MR at 70, 74.) The radiologist recommended "if clinically warranted, repeat x-rays of the right knee with oblique projection and sunrise view." (*Id.* at 74) Dr. Esquivia submitted a consultation request for Plaintiff to return in one week and instructed Plaintiff to use a cane to ambulate in the meantime. (*Id.* at 60, 63.)

Plaintiff returned for his follow-up with Dr. Esquivia on April 5, 2011. (*Id.* at 61.) X-rays with oblique and sunrise view were taken of his right knee the following day. (*Id.* at 73.) There was no evidence of fracture or

dislocation, but the x-ray revealed "a moderate intra-articular joint effusion located in the suprapatellar bursa." (*Id.*) Then on May 3, 2011, despite having a follow-up appointment scheduled with Dr. Esquivia, Plaintiff signed a DC4-711A medical refusal form refusing his follow-up appointment and all other orthopedic appointments. (MR at 5, 12.) Plaintiff's knee healed and no longer causes him pain or any other problems. (Pl. Depo. at 12, ln. 13–21.)

## III.  STANDARD OF REVIEW

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that an act or omission committed by a person acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir.1995).

As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), "[f]actual allegations must be enough to raise a right to relief above the speculative level," and the complaint "must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Further, in *Ashcroft v. Iqbal*, 556 U.S. 662, 1951-53 (2009), the Supreme Court stated that *Twombly* "expounded the pleading standard for all civil actions," and

conclusory allegations that "amount to nothing more than a formulaic recitation of the elements of a constitutional . . . claim" are "not entitled to be assumed true," and, to escape dismissal, complaint must allege facts sufficient to move claims "across the line from conceivable to plausible."

While a *pro se* litigant's allegations are entitled to the benefit of liberal construction, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), a court does not have "license . . . to rewrite an otherwise deficient pleading [by a *pro se* litigant] in order to sustain an action." *GJR Invs. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (overruled on other grounds by *Iqbal).*

## IV.  DISCUSSION

### A.  *Eight Amendment Claims*

Plaintiff claims Defendants Dr. Carrero, West, and Wolf were deliberately indifferent to Plaintiff's serious medical needs. He claims in count one that Dr. Carrero refused to reschedule immediately Plaintiff's surgery and provide Plaintiff pain medication, despite knowing that Plaintiff still wanted and needed surgery and despite knowing there was a high probability of risk from further delay. In count two Plaintiff alleges Defendant West refused to refer Plaintiff's medical grievance to the Chief Medical Officer despite knowing there was a high probability that Plaintiff's

injury would get worse with delay. In count three Plaintiff asserts that

Defendant Wolf failed to ensure Plaintiff's surgery was rescheduled despite

knowing there was a high probability of risk in delaying treatment.      The

Eighth Amendment provides the right to be free from cruel and unusual

punishment. U.S. Const. amend. VIII. The Supreme Court has held that

deliberate indifference to the serious medical needs of prisoners violates

the Eighth Amendment's prohibition against cruel and unusual punishment.

*Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). An Eighth Amendment

claim contains both an objective and subjective component. *Taylor v.*

*Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). Under the objective prong, a

plaintiff must present evidence of an objectively serious medical need.

*Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). A plaintiff has a

"serious medical need" when the condition "is one that has been diagnosed

by a physician as mandating treatment or one that is so obvious that even

a lay person would easily recognize the necessity for a doctor's attention."

*Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994). In

either case, however, "the medical need must be one that, if left

unattended, poses a substantial risk of serious harm." *Brown v. Johnson*,

387 F.3d 1344, 1351 (11th Cir. 2004) (citing *Farrow*, 320 F.3d at 1243).

        Under the subjective prong, a plaintiff must provide evidence that the

defendant acted with deliberate indifference to that serious medical need. *McElligott v. Foley*, 182 F.3d 1248, 1254 (11th Cir. 1999). The Eleventh Circuit has clarified that under this prong, the plaintiff must prove that the defendant: (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) did so by conduct that is more than gross negligence. *Goodman v. Kimbrough*, 718 F.3d 1325, 1331-32 (11th Cir. 2013)); *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003). Subjective knowledge of a risk of serious harm requires that the defendant actually knew of the risk of serious harm. *Goodman*, 718 F.3d at 1331–32. The prisoner must demonstrate that the defendant's response was so inadequate as to "constitute an unnecessary and wanton infliction of pain," and was not "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258.

"Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours . . . ." *McElligot*, 182 F.3d at 1255. Where treatment is delayed, however, "the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Farrow*, 320 F.3d at 1246

(quoting *McElligot*, 182 F.3d at 1255)). Thus, where the case turns on an alleged delay in providing medical care, rather than the type of medical care provided, courts should consider: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay. *Goebert v. Lee Cnty.,* 510 F.3d 1312, 1327 (11th Cir. 2007) (*citing Hill*, 40 F.3d at 1189).

### 1.   Dr. Carrero

Turning first to Plaintiff's claim against Dr. Carrero, Plaintiff says Dr. Carrero was deliberately indifferent to Plaintiff's serious medical needs because she refused to provide pain medication and refused to immediately reschedule Plaintiff's surgery. Plaintiff says that Dr. Carrero knew surgery was urgent and that Plaintiff faced a serious risk of harm if the surgery was not performed quickly.

This case is not about whether surgery should have been performed on Plaintiff's knee. Rather, Plaintiff's claim focuses primarily upon not having surgery as quickly as Plaintiff wished. Indeed, the knee surgery was performed and Plaintiff has fully recovered from the surgery with no further knee problems. Thus, the Court must determine whether Plaintiff had a serious medical need, whether the delay worsened his condition, and the reason for the delay. *See Goebert*, 510 F.3d at 1327.

While there is no dispute that Plaintiff had a medical condition diagnosed by a physician as needing treatment, that does not mean Plaintiff necessarily had a serious medical condition. Dr. Maier asserts that a meniscal tear— like the one Plaintiff had— is not a medical or surgical emergency and can be handled conservatively without immediate surgical intervention. Dr. Maier says the condition can be treated with medication and assisted walking devices to maintain the patient ambulatory.

On the other hand, the consultative report from Dr. Esquivia—the orthopedic specialist—noted that Plaintiff needed surgery and included the notation "urgent."  This is a classic example of conflicting evidence from which a reasonable jury could conclude that Plaintiff's meniscal tear was a serious medical need. And surely, if a reasonable jury could conclude that Plaintiff had a serious medical need, a reasonable jury could also conclude that Dr. Carrero was aware of Plaintiff's serious medical need. There is no question that Dr. Carrero knew Dr. Esquivia advised that the surgery was urgent as evidenced by Dr. Carrero's check mark on the surgery request form as "urgent."

While the surgery may have urgent there is no evidence that Plaintiff faced a serious risk of harm if the surgery was delayed. Plaintiff admits that despite Dr. Esquivia's "urgent" notation, Dr. Esquivia did not say anything

about what would happen if the surgery was not performed quickly. None

of Dr. Esquivia's medical records suggest that Plaintiff would suffer

additional injury or face any other risk without immediate surgery.

Further, Dr. Maier states that a meniscal tear like Plaintiff's is not a

medical or surgical emergency, can be handled conservatively with pain

medications and ambulatory assistance, and can be handled without

immediate surgical intervention. Dr. Maier avers that meniscal knee

surgery, such as Plaintiff's, is an elective surgery. This view is supported

by the fact that Plaintiff was able to unilaterally refuse his scheduled

surgery because of an attorney appointment and in the meantime, received

pain medications, anti-inflammatories, a knee brace, and medical passes.

*See Fourstar v. Archer*, 2015 WL 7307038, at *2 (N.D. Fla. Oct. 13, 2015)

(plaintiff's prior refusal of surgery for his knees indicates that there is an

elective quality to the surgery that essentially amounts to a difference of

medical opinion as to the course of treatment).  Therefore, because

Plaintiff's knee surgery had an elective quality, any difference in medical

opinion regarding the course of treatment, is not actionable under the

Eighth Amendment. *See Harris v. Thigpen*, 941 F.2d 1495, 1505–07 (11th

Cir. 1991); *see also Leigh v. Armor Med. Servs.*, 635 F. App'x 664, 666

(11th Cir. 2015) (although specialist wrote urgent below surgery

recommendation, medical director's opinion that there was no risk of serious harm if surgery was delayed was a difference in medical opinion and not sufficient for a deliberate indifference claim).

Most notably, there is no evidence on this record that Plaintiff suffered any further harm from the delayed surgery. Plaintiff received a knee brace to assist him with walking. He also received low bunk, no lifting, and no sports medical passes to assist him with carrying on daily activities. Plaintiff admits that while waiting for the surgery to be rescheduled, his knee was "ok" for a while.  And even though Plaintiff testified that the more he walked on it the more inflamed it became and eventually caused him to fall, Plaintiff's pain and inflammation was nothing new and not something that started only after the surgery was rescheduled.  Indeed, Plaintiff admits that his knee collapsed on several occasions prior to 2010. Furthermore, during the period of time the surgery was being rescheduled Plaintiff continuously received ibuprofen for pain and inflammation, as well as Naprosyn when requested. Plaintiff admits that when his knee acted up he could rest for two or three days and then either go about his daily activities or go to medical. Importantly, there is no evidence that Plaintiff went to medical for any knee-related falls between his original surgery date and the date he had surgery.

Although Plaintiff asserts that falling caused additional damage to his knee, there is no evidence to support this argument. Dr. Esquivia's findings did not change during the second consultation, nor did Plaintiff need any other surgery or medical intervention resulting from additional injury. Therefore, Plaintiff has provided no evidence demonstrating that the delay worsened his condition. *See Jackson v. Jackson*, 456 F. App'x 813, 815 (11th Cir. 2012) (six-month delay in receiving hernia surgery did not worsen plaintiff's condition).

Furthermore, no reasonable jury could conclude that Dr. Carrero delayed Plaintiff's surgery. Dr. Esquivia determined that Plaintiff needed surgery on May 18, 2010. Once Plaintiff returned to Cross City CI, on May 21, 2010 Dr. Carrero timely reviewed Dr. Esquivia's evaluation and immediately submitted an urgent surgery request for Plaintiff. Plaintiff's surgery was scheduled shortly thereafter for June 25, 2010.

Plaintiff did not have the surgery as scheduled on June 25, 2010 because of any delay by Defendant. To the contrary, the surgery did not go forward on June 25, 2010 because (after Plaintiff was transferred to Lake Butler for the surgery) Plaintiff signed a medical refusal refusing the surgery because he had a scheduled legal visit on June 24, 2010. In the refusal form Plaintiff expressly acknowledged that he "voluntarily assume[s]

the risks and accept[s] the consequences of [his] refusal of the

procedure/treatment and [he is] releasing the Department of Corrections,

all health care providers, the facility, and facility staff from any and all

liability for ill effects that may result from [his] refusal of treatment." (MR. at

4.)[4]  Despite Plaintiff's erroneous belief that his surgery would be

automatically rescheduled, the undisputed evidence demonstrates that

once an inmate signs a refusal form, the procedure is not automatically

rescheduled.[5] Moreover, when Plaintiff returned to Cross City CI, Dr.

Carrero reviewed Plaintiff's surgery refusal and evaluated his chart for any

serious risk to his health, but found none.

Plaintiff did not follow up with medical about his surgery until August

2010. When he returned to medical, he was advised that if he still wanted

surgery he would have to start the whole process again as required by

FDOC policy, including reinitiating the sick call procedure to get a consult

---

[4] Plaintiff asserts that when he signed the refusal form the form was blank and he did not have an opportunity to read the contents of the refusal. (ECF No. 115 at 3.) The only parts of the form that were not pre-printed is the "X" marking the "Medical Services" box option under the pre-printed statement "[t]his is to certify that I am refusing the following:", the notation "Amb Surg (Arthroscopy Rt knee) with Dr. Esquivia Scheduled on 6/25/10" next to the pre-printed Medical Services box identifying the medical service being refused, and the signatures. (MR at 4.) This wholly belies any suggestion that he did not know what he was signing.

[5] Although Plaintiff contends that an un-named nurse told him that by signing the refusal form, his surgery would be rescheduled, whatever the nurse told Plaintiff is inadmissible hearsay evidence if offered to prove that his surgery would be automatically rescheduled.

for a visit with the specialist and an order from the specialist for surgery. Plaintiff acknowledged that Cross City CI's sick call procedure mandated that an inmate must go to sick call three times before the inmate sees the doctor. Although Plaintiff says he complied and reinitiated the sick call procedure, there is no evidence that Plaintiff went to medical until his periodic medical screening on September 8, 2010. At that time he requested to be reconsidered for surgery. Dr. Carrero advised the nurse that Plaintiff needed to return to sick-call for re-assessment of his knee issue. Plaintiff finally returned to sick-call three times according to Cross City CI policy on September 9, 2010, September 14, 2010, and September 22, 2010.

On September 23, 2010—the day after Plaintiff had three sick-call visits—Dr. Carrero evaluated Plaintiff. She completed a routine orthopedic consultation request for Plaintiff seven days later. Once Plaintiff signed the request form on October 1, 2010, the orthopedist appointment was scheduled for November 2, 2010. On November 2, 2010, Dr. Esquivia re-evaluated Plaintiff and renewed his original surgery request. Dr. Carrero reviewed Dr. Esquivia's renewed request the following day and submitted a routine request for surgery approval that same day. Plaintiff's surgery was scheduled for December 20, 2010. However, the surgery was cancelled

because during pre-op Dr. Skidmore identified a possible latex allergy.

Plaintiff remained at RMC until January 24, 2011. Two days after Plaintiff returned to Cross City CI, Dr. Carrero reviewed Plaintiff's transfer record and noted that he possibly needed a consult and continued Plaintiff's medical passes. That same day, Plaintiff reported to sick call inquiring about his surgery. Plaintiff did not return to sick call again until he was called to medical on March 7, 2011 to discuss the cancelled surgery and possible latex allergy. After it was determined that Plaintiff did not have an allergic reaction to latex gloves, Plaintiff requested to proceed with surgery. He was then transferred back to RMC on March 21, 2011, and underwent surgery on March 23, 2011.

Plaintiff erroneously believed that his surgery would automatically be rescheduled. Likewise, he erroneously relied on staff to relay to Dr. Carrero that he wished to re-initiate the consultation process. The fact that Plaintiff did not know that his refusal voided the surgery order, and that the surgery could not be rescheduled without a new order, is not Dr. Carrero's fault nor does it demonstrate that Dr. Carrero was deliberately indifferent. Indeed, without a new surgery order from the orthopaedic specialist, Dr. Esquvia, Dr. Carrero could not even reschedule the surgery.  Moreover, the cancellation of Plaintiff's surgery due to Plaintiff's possible latex allergy,

was not attributable in any fashion to Dr. Carrero.

Instead, the evidence demonstrates that any delay in Plaintiff's surgery was the result of his own actions. It was Plaintiff's decision to cancel his surgery the first time, just days before the surgery, because he previously had arranged and paid in advance for an unrelated legal visit. The cancellation had nothing whatsoever to do with Dr. Carrero.

And while Plaintiff complains that Dr. Carrero did not automatically reschedule the surgery, the uncontested evidence of record demonstrates that Dr. Carrero could not simply reschedule the surgery without requiring Plaintiff to go through the process, including an evaluation by a specialist, before rescheduling the surgery. Plaintiff's claim that it was wrong to make him go through the process again because his surgery was not elective is not supported on this record. Rather, the policy Dr. Carrero was required to follow for meniscal tear surgery was to require sick call visits and then have Plaintiff evaluated by the specialist before surgery was performed.

Although approximately two months passed between the time Plaintiff returned to Cross City CI after his surgery was cancelled due to a possible latex allergy and when Plaintiff had surgery, there is no evidence in the record demonstrating that Dr. Carrero could have or should have somehow expedited the process. According to Dr. Maier, medical

appointments must be made based on the surgeon and off-site facility's availability. Priority must be given to inmates according to the nature of their medical problems. Dr. Maier avers that it can take three to four months to schedule routine surgery.  Based upon these undisputed facts, no reasonable jury could conclude that Dr. Carrero was deliberately indifferent to Plaintiff's medical condition or that Dr. Carrero delayed Plaintiff's surgery.

Further, based upon the undisputed evidence that after the surgery Plaintiff has not had any problems or that the delay caused Plaintiff to undergo further or different surgery, no reasonable jury could conclude that Plaintiff suffered any further harm from the delay. Likewise, no reasonable jury could conclude that the delay was attributable to Dr. Carrero.

Similarly, to the extent Plaintiff claims Dr. Carrero refused to provide Plaintiff pain medication, the undisputed evidence provides no support for this claim. Rather, the medical records show that Plaintiff continuously received pain medication. Plaintiff's allegation that Dr. Carrero refused to provide pain medication focuses on the time-period beginning September 23, 2010.  Notably, at the time, Plaintiff did not have an active Naprosyn prescription. Further, Plaintiff could have initiated the sick-call process for

pain medication, at which time Dr. Carrero would have evaluated his need for pain medication. The medical records show that Plaintiff presented to sick-call on September 9, 2010, and September 14, 2010, during which the nurse instructed Plaintiff to take ibuprofen for pain, which is available in the dorm upon request. The nurse provided A-balm for pain, told Plaintiff to elevate his leg and apply ice to his knee. The nurse also gave Plaintiff a knee brace to use.  The medical records do not show that Plaintiff requested any additional pain medication.

Further, although Dr. Carrero evaluated Plaintiff on September 23, 2010, the records do not evidence that Plaintiff asked for pain medication. Indeed, Plaintiff's medical records show that he did not report to sick-call seeking pain medication until January 26, 2011.  After the nurse sent Plaintiff's chart to Dr. Carrero, Dr. Carrero submitted a 90-day Naprosyn prescription the very next day. Dr. Carrero also refilled the Naprosyn prescription for Plaintiff after he had surgery.

Although Plaintiff claims that Dr. Carrero refused to refill his prescription, he admitted at his deposition that he received ibuprofen and Naproxen from the time he arrived at Cross City. Furthermore, even if Dr. Carrero had refused to refill his prescription—which she did not—Plaintiff

nonetheless received ibuprofen, which is similar to Naproxen and also used to treat inflammation. Plaintiff's desire for a different medication does not give rise to a constitutional violation. *See Harris*, 941 F.2d at 1505 ("[a] simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis and course of treatment [does not] support a claim of cruel and unusual punishment").

Most importantly, there is no evidence that Plaintiff suffered any risk of harm by not receiving a different medication.  Accordingly, the Court concludes that based upon the uncontroverted evidence, no reasonable jury could conclude that Dr. Carrero was deliberately indifferent to Plaintiff's serious medical needs. Plaintiff's claim in count one against Dr. Carrero, therefore, should be dismissed.

### 2.   *Defendant West*

The undisputed evidence also demonstrates that Defendant West was not deliberately indifferent to Plaintiff's serious medical needs.

"Merely signing a grievance does not create liability where the signer had no personal involvement in the alleged violations." *Cary v. McNeil*, No. 1:09CV18-MP/AK, 2009 WL 631230, at *1 (N.D. Fla. Mar. 6, 2009) (citing *Manney v. Moore*, 151 F. Supp. 2d 967 (N.D. Ill. 2001)). The only

involvement Defendant West had in this matter was signing the responses to Plaintiff's October 12, 2010 and January 25, 2011 formal grievances. Plaintiff has offered no evidence suggesting that Defendant West personally reviewed Plaintiff's medical records and determined Plaintiff was receiving proper care.

Defendant West avers that his signature on the grievance response indicates that the response crossed his desk in order to route it to the proper entities. Defendant West also states that a medical grievance, such as Plaintiff's, is routed to the Medical Department for a response from the Chief Medical Officer.  Both responses include Dr. Carrero's signature—a fact which Plaintiff does not contest. Accordingly, on these facts no reasonable jury could conclude that Defendant West was deliberately indifferent to Plaintiff's serious medical needs.

Even assuming Defendant West personally had reviewed Plaintiff's medical records and personally denied the grievance, doing so would not constitute deliberate indifference to serious medical needs. While delaying medical treatment can give rise to an Eight Amendment claim, nothing in the evidence suggests that the grievance denials had any effect whatsoever on the rescheduling of his surgery.

On September 30, 2010—before Plaintiff filed his October 2010 grievance—Dr. Carrero already had completed a routine orthopaedic consultation request for Plaintiff, which was ultimately scheduled for November 2, 2010. Plaintiff was advised in the grievance response that the proper procedure for rescheduling the recommended surgery had been followed. Then, as scheduled, Plaintiff had his orthopaedic consultation with Dr. Esqiuvia on November 2, 2010. Dr. Esquivia's renewed request for prior approval for the arthroscopy followed and Plaintiff's surgery was scheduled for December 20, 2010.

Similarly, Plaintiff was informed in the February 15, 2011 grievance denial that the surgery was being rescheduled. Then, Plaintiff was called to Medical on March 7, 2011 to discuss the surgery and possible latex allergy. The surgery was then scheduled for March 23, 2011.  It is undisputed that independent of the grievance system, Plaintiff could have submitted a sick call slip directly to the Medical Department if he believed his surgery was not being rescheduled properly.

Accordingly, even if Defendant West personally had denied Plaintiff's grievances, the denials did not delay treatment. Plaintiff has failed to demonstrate that Defendant West was deliberately indifferent to Plaintiff's

medical needs. Defendant West is entitled to judgment as a matter of law on count two.

### 3.    Defendant Wolf

Likewise, the undisputed evidence demonstrates that Defendant Wolf was not deliberately indifferent to Plaintiff's serious medical needs.

Consistent with Defendant Wolf's responsibilities as the Senior HSA, she responded to Plaintiff's January 25, 2011 grievance. As part of any review she would review the inmate's chart and other relevant records and discuss the issue with a medical provider if necessary. Then, the Chief Health Officer reviewed her response. It is undisputed that Dr. Carrero also signed the grievance response. And despite Plaintiff's assertion that Defendant Wolf failed to ensure Plaintiff's surgery was rescheduled, it is undisputed that Defendant Wolf did not have control over surgery scheduling, nor were requests for surgery submitted to her.  Defendant Wolf's mere response to Plaintiff's grievance about surgery does not constitute deliberate indifference to Plaintiff's needs. *See Hernandez v. Sec'y Fla. Dep't of Corrections*, 611 F. App'x 582, 584 (11th Cir. 2015) (concluding that summary judgment was appropriately granted in health service administrator's favor because she merely responded to plaintiff's

grievance about a cancelled appointment, informing plaintiff that the appropriate personnel had rescheduled the appointment). Defendant Wolf, therefore, is entitled to judgment as a matter of law on count three.

### 4.    *Compensatory and Punitive Damages*

Plaintiff also is not entitled to compensatory or punitive damages on those claims. "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. § 1997e(e). "[T]he physical injury must be more than de minimis, but need not be significant." *Harris v. Garner*, 190 F.3d 1279, 1286 (11th Cir. 1999). Discomfort does not equate to physical injury. *Dixon v. Toole*, 225 F. App'x 797, 799 (11th Cir. 2007); *see also Mann v. McNeil*, 360 F. App'x 31, 32 (11th Cir. 2010) (plaintiff's claims for compensatory and punitive damages were barred by § 1997e(e) where plaintiff complained of vague injuries to his back and scrapes and marks on his knees and legs); *Parker v. Dubose*, No. 3:12cv204/MCR/CJK, 2013 WL 4735173, at *2 (N.D. Fla. Sept. 3, 2013) (concluding that plaintiff's black eye, bloody lip, scrapes, abrasion, and back pains did not amount to more than *de minimis* physical injury and were insufficient to meet § 1997e(e)'s

physical injury requirement).

Here, there is no evidence that Plaintiff suffered any physical injury or exacerbation of his medical condition from the delay in receiving surgery. Plaintiff's occasional knee pain and inflammation amount to nothing more than *de minimis* injuries. Plaintiff's speculative belief that falling resulted in additional injury to his knee is wholly unsupported and is instead contradicted by the medical records. Plaintiff does not dispute that he completely recovered after the surgery and has no further problems. Thus, Plaintiff is not entitled to recover compensatory or punitive damages.

## B.   *Gross Negligence Claims*

Plaintiff alleges in counts four through seven that Defendants FDOC, Dr. Carrero, West, and Wolf were grossly negligent in ensuring Plaintiff's medical needs were met.

### 1.   *Jurisdiction*

Defendants argue that because no basis for federal jurisdiction exists, the Court should decline to exercise supplemental jurisdiction over his state law claims. "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In addition,

in any civil action of which the district courts have original
jurisdiction, the district courts shall have supplemental
jurisdiction over all claims that are so related to the claims in
the action within which such original jurisdiction that they form
part of the same case or controversy under Article III of the
United States Constitution.

28 U.S.C. § 1367(a). The district court may, however,

decline to exercise supplemental jurisdiction over a claim under
subsection (a) if– (1) the claim raises a novel or complex issue
of State law, (2) the claim substantially predominates over the
claim or claims over which the district court has original
jurisdiction, (3) the district court has dismissed all claims over
which it has original jurisdiction, or (4) in exceptional
circumstances, there are other compelling reasons for declining
jurisdiction.

§ 1367(c). "In making that determination, the judge should 'take into

account concerns of comity, judicial economy, convenience, fairness, and

the like.'" *Crosby v. Paulk*, 187 F.3d 13369, 1352 (11th Cir. 1999) (quoting

*Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir.

1996)).

In this case, the Court has original jurisdiction over Plaintiff's

constitutional claims and supplemental jurisdiction over his state law claims

because the state law claims form part of the same case or controversy as

his constitutional claims. Although Plaintiff has failed to prove that

Defendants violated his constitutional rights, the Court finds no reason to

decline jurisdiction over his state law claims.

While this case does involve a novel issue of state law, as will be discussed, Plaintiff's claims can be resolved independent of the novel issue. Second, Plaintiff's state law claims do not predominate over his constitutional claims. In essence, Plaintiff's state law claims are equivalent to those in his constitutional claims, with the exception of his negligence claim against the FDOC. Third, the Court sees no reason to remand the state law claims to state court when they can also be resolved on the merits at the same juncture here.  Fourth, the Court finds no other compelling reason to decline jurisdiction, nor do Defendants offer one. Comity, judicial economy, and convenience all support the conclusion that the Court should continue to exercise supplemental jurisdiction over these claims. The Court, therefore, declines to remand the state law claims to state court.

### 2.    *Section 768.28(9)(a) Immunity*

Next, Defendants argue that Defendants Dr. Carrero, West, and Wolf are immune from Plaintiff's gross negligence claims in their individual capacities. Under Fla. Stat. § 768.28(9)(a),

> [n]o officer, employee, or agent of the state or of any of its
> subdivisions shall be held personally liable in tort or named as a party

defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

"Conduct meeting the 'wanton and willful' standard in the context of § 768.28(9)(a), must be 'worse than gross negligence,' . . . and 'more reprehensible and unacceptable than mere intentional conduct.'" *Kastritis v. City of Daytona Beach Shores*, 835 F. Supp. 2d 1200, 1225 (M.D. Fla. 2011) (citations omitted). Bad faith under § 768.28(9)(a) has been equated with the actual malice standard. *Bloom v. Alvereze*, 498 F. App'x 867, 881 (11th Cir. 2012). "[C]onduct committed in bad faith has been characterized as conduct acted out with actual malice." *Kastritis*, 835 F. Supp. 2d at 1225 (citing *Parker v. State Bd. Of Regents ex rel. Florida State Univ.*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998)).

Neither Defendant Dr. Carrero, West, nor Wolf acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of Plaintiff's rights. Despite Plaintiff's conclusional allegations that each of the Defendants knowingly and intentionally violated Plaintiff's rights by delaying and denying medical care, for the reasons previously discussed, the undisputed evidence fails to support this assertion. Nor is

there any evidence Plaintiff points to suggesting that any of the actions of Dr. Carrero, West, or Wolf's were done with malice. Defendants West and Wolf were merely involved with the administrative processing of Plaintiff's grievances and acted pursuant to policy.

Similarly, although Plaintiff says Dr. Carrero was upset that Plaintiff refused surgery and that he would have to start the whole process over, the undisputed evidence shows that policy—not Dr. Carrero—required Plaintiff to reinitiate the process for surgery. While Plaintiff says Dr. Carrero refused to provide Plaintiff pain medication, there is no evidence that Dr. Carrero refused to refill Plaintiff's Naprosyn prescription when actually requested by Plaintiff. Plaintiff was still receiving pain and anti-inflammatory medication in the form of ibuprofen. Even if Defendants were somehow negligent, under Florida law , as employees of the FDOC they are immune from suit for these actions in their individual capacities.

Accordingly, Defendants are entitled to judgment as a matter of law on Plaintiff's negligence claims asserted against them in their individual capacities.

### 3. *Section 95.11(5)(g) Time Bar*

Defendants further argue that Plaintiff's state law negligence claims

are time-barred and should, therefore, be dismissed.

Fla. Stat. § 95.11(5)(g) provides that "an action brought by or on behalf of a prisoner, as defined in s. 57.085, relating to the conditions of the prisoner's confinement," must be brought within one year.[6] A civil action is barred unless begun within the time period prescribed in chapter 95, or if a different time is prescribed elsewhere in the statutes, within the time prescribed elsewhere. Fla. Stat. § 95.011. Fla. Stat. § 768.28(14) provides, however, that "[e]very claim against the state or one of its agencies or subdivisions for damages for a negligent or wrongful act or omission pursuant to this section shall be forever barred unless the civil action is commenced by filing a complaint in the court of appropriate jurisdiction within 4 years after such claim accrues . . . ."  The issue of which statute controls is an unresolved issue under Florida law.

The Fifth District Court of Appeal ("Fifth DCA") has held that the four-year statute of limitations applies for claims based on waiver of sovereign immunity, as opposed to the one-year state of limitations for prisoner claims related to conditions of confinement. *Calhoun v. Nienhuis*, 110 So.

---

[6] Fla. Stat. § 57.085 defines the term "prisoner" as "a person who has been convicted of a crime and is incarcerated for that crime or who is being held in custody pending extradition or sentencing."

3d 24, 26 (Fla. 5th DCA 2013).[7]  The Fifth DCA concluded that the four

year statute applied for three reasons.

First, chapter 95's exception clause clearly provides that the periods

of time provided in chapter 95 do not apply if a different period is provided

elsewhere in the statutes. *Id.* Second, the Fifth DCA reasoned that "even

absent chapter 95's exception clause, section 768.28's statute of

limitations supersedes other statutes in suits against government entities."

*Id.* (citing *Beard v. Hambrick*, 396 So. 2d 708 (Fla. 1981) ("We believe that

the legislature intended that there be one limitation period for all actions

brought under section 768.28. We base this belief on the prerequisite

notice provisions of this section and the need to have a uniform period for

actions against governmental entities."); *Fla. Dep't of Health & Rehab.*

*Servs. v. S.A.P.*, 835 So. 2d 1091, 1096 (Fla. 2002) ("Time limitations on

legal actions in Florida ordinarily are governed by the statutes of limitation

---

[7] In a prior decision, the Fifth DCA held that a prisoner's negligence action against a sheriff for alleged exposure to toxic fumes was governed by § 95.11(5)(g)'s one-year statute of limitations. *See Nicarry v. Eslinger*, 990 So. 2d 661, 664 (Fla. 5th DCA 2008). In *Calhoun*, however, the Fifth DCA distinguished *Nicarry* from *Calhoun*, noting that *Nicarry* did not address the applicability of § 768.28(14). 110 So. 3d at 26–27. Although the prisoner appellant in *Nicarry* argued that the four-year statute of limitations for negligence claims applied, the appellant's argument appears to have been premised on the fact that he was challenging a single instance of negligence rather than ongoing conditions of confinement. 990 So. 2d at 664–65. The Fifth DCA concluded that "the one-year statute of limitations applies to both ongoing and isolated conditions of a prisoner's confinement." *Id.* at 665.

set forth in chapter 95, but . . . time limitations on chapter 768 actions are

controlled by section 768.28(14).")). Third, the Fifth DCA explained that,

> the Legislature has created express exceptions to the
> applicability of section 768.28's statute of limitations, and
> prisoner claims under section 95.11(5)(g) are not one of those
> exceptions. Specifically, section 768.28(14) excepts claims for
> contribution and medical malpractice, providing that their
> respective statutes of limitations apply. Thus, under the maxim
> *inclusio unius est exclusio alterius*, prisoner claims within
> section 95.11(5)(g) should not be construed as being an
> exception to section 768.28(14).

*Id.*

The First District Court of Appeal ("First DCA") reached a different

conclusion, holding that the one-year statute of limitations applicable to

actions brought by a prisoner relating to the conditions of confinement

applies, rather than the four-year statute of limitations applicable to claims

against the state for damages for a negligent or wrongful act. *Green v.

Cotrell*, 172 So. 3d 1009, 1011 (Fla. 1st DCA 2015), *review granted*, 2016

WL 765894 (Fla. Feb. 19, 2016).

The First DCA's reasoning was two-fold. First, the court noted that §

95.11(5)(g) was adopted in 1996. *Id.* (citing Ch. 96-106, Laws of Fla.).

Meanwhile, § 768.28(14) was enacted in 1973. *Id.* (citing Ch. 73-313, Laws

of Fla.). Second, the court concluded that the one-year statute of

limitations is more specific because it applies only to actions brought by or on behalf of prisoners regarding their confinement. *Id.* Section 768.28(14) is more general, however, "because it applies to any claims 'against the state or one of its agencies or subdivisions for damages for a negligent or wrongful act or omission.'" *Id.* (quoting § 728.28(14)).

This issue is currently pending before the Florida Supreme Court. *See Green v. Cottrell*, No. SC15-1805 (Fla. Feb. 19, 2016).[8] Because the Florida Supreme Court has decided the issue yet, this Court must follow the opinions of Florida's intermediate courts, unless this Court is persuaded that the Florida Supreme Court would decide otherwise. *See Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1321 (S.D. Fla. 2010). Where the intermediate courts are split on the issue, however, the court should apply the rule representing the overwhelming weight of authority. *See Small Bus. Admin. v. Echevarria*, 864 F. Supp. 1254, 1262 (S.D. Fla. Sept. 9, 1994). But where, as here, "the weight of authority is evenly balanced, the court must make an 'educated guess' as to how the Florida Supreme Court would resolve the conflict." *Id.*

The Court concludes that the view of the Fifth DCA that the four-year

---

[8] Oral argument was held on August 30, 2016. *Id.*

statute of limitations for negligence actions in § 768.28(14) controls is better reasoned. In addition to the reasons discussed by the Fifth DCA in *Calhoun*, the First DCA's rejection of *Calhoun* is problematic.

Asserting that the Fifth DCA gave too expansive a reading to the limiting section contained in chapter 95, the First DCA reasoned that reading chapter 95's limiting clause "to mean that all other statute of limitations periods outlined in the Florida Statutes supersede any statute of limitations period provided for in chapter 95 . . . "would render the subsequently passed and more specific section 95.11(5)(g) a nullity from the time of its original passage." *Green*, 172 So. 3d at 1012. But, § 95.11(5)(g) does not pertain solely to prisoner claims of *negligence* based on the conditions of confinement. Indeed, while § 768.28(14) may provide four years for an inmate to initiate an action premised on negligence, the inmate would nonetheless only have one year to initiate an action premised on something besides negligence. Thus, § 95.11(5)(g) would not automatically be "a nullity form the time of its original passage."

The First DCA also found that the Fifth DCA too expansively interpreted the case law because the cases upon which the Fifth DCA relied *supported* the First DCA's determination that specific statutes supersede general statutes governing the same topic. *Id.* (citing *Public*

*Health Trust of Dade Cnty. v. Menendez*, 584 So. 2d 567 (Fla. 1991);

*Beard*, 396 So. 2d at 708). Contrary to the Fifth DCA's assertion, however,

*Public Health* held that the four-year statute of limitations in § 768.28(11)

for medical malpractice claims against a governmental entity prevails over

the two-year period contained in § 95.11(4)(b),[9] specifically stating that §

95.011 "clearly provides that the periods of time provided in chapter 95 do

not apply if a different period is provided elsewhere in the statutes." 584

So. 2d at 569. Similarly, in *Beard*, the Florida Supreme Court held that the

four-year statue of limitations for wrongful death actions against

governmental entities in § 768.28(12) applies, rather than the two-year

statute of limitations prescribed in section 95.11(4)(c). 396 So. 2d at 712.

The court there reasoned "the legislature intended that there be one

limitation period for all actions brought under section 768.28," based on

"the prerequisite notice provisions of [section 768.28] and the need to have

a uniform period for actions against governmental entities." *Id.* Thus, the

Court's educated guess is that the Florida Supreme Court will conclude

that the four year period in § 768.28(14) applies cases where prisoners

bring claims for negligence against governmental entities. The Court,

---

[9] The facts at issue in *Public Health* occurred before § 768.28(14) was amended to except medical malpractice actions.

therefore, concludes that Plaintiff's negligence claim against the FDOC in this case is not barred by the statue of limitations.[10]

The discussion of which statute of limitations applies may be academic because even if Plaintiff's state law claims are not time barred, Plaintiff has failed to show that Defendants were negligent.

Defendants also argue that the negligence claim against Dr. Carrero is barred by the two-year statute of limitations for medical negligence claims because the claim should be construed as a medical negligence claim since it arose from the alleged failure to receive medical care. *See* § 768.28(14) (providing that a medical negligence action "arising from medical malpractice or wrongful death must be commended within the limitations for such actions in s. 95.11(4)"); § 95.11(4) ("[a]n action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred . . . or discovered, . . . or should have been discovered with the exercise of due diligence"); *Stubbs v. Surgi-Staff, Inc.*, 78 So. 3d 69, 70 (Fla. 4th DCA 2012). A claim for medical

---

[10] Plaintiff commenced his negligence claims in state court on December 9, 2013, for actions that took place, at the latest, in March 2011. (ECF No. 3-1 at 2, 4.) Under the mailbox rule, a *pro se* prisoner's filing is deemed to be filed on the date it is delivered to prison authorities for mailing. *Adams v. United States*, 173 F.3d 1339, 1341 (11th Cir. 1999). Plaintiff's complaint is not dated, however, nor does it evidence the date upon which he delivered it to prison authorities for mailing. Thus, the Court construes the date upon which the complaint was filed in state court as the date of filing.

negligence or malpractice "is one 'arising out of the rendering of, or the failure to render, medical care or services.'" *Joseph v. Univ. Behavioral LLC*, 71 So. 3d 913, 917 (Fla. 5th DCA 2011) (quoting *Mobley v. Gilbert E. Hirschberg, P.A.*, 915 So. 2d 217, 218 (Fla. 4th DCA 2005)). But, "[t]he fact that a wrongful act occurs in a medical setting does not necessarily mean that it involves medical malpractice [or medical negligence]." *Id.* (citing *Robinson v. W. Fla. Reg'l Med. Ctr.*, 675 So. 2d 266 (Fla. 1st DCA 1996); *Durden v. Am. Hosp. Supply Corp.*, 375 So. 2d 1096 (Fla. 3d DCA 1979)). "The wrongful act must be directly related to the improper application of medical services and the use of professional judgment or skill." *Id.* (citing *Liles v. P.I.A. Medfield, Inc.*, 681 So. 2d 711 (Fla. 2d DCA 1995); *S. Baptist Hosp. of Fla., Inc. v. Ashe*, 948 So. 2d 889, 890 (Fla. 1st DCA 2007). A court must review each claim on a case-by-case basis to determine whether a suit raises an issue of ordinary negligence or medical malpractice. *Ashe*, 948 So. 2d at 890.

As the Court previously concluded, Plaintiff's claim here is not that Defendant Carrero made a medical error. *See* ECF No. 58 at 10–12; ECF No. 78 at 18–19; ECF No. 88 (accepting the report and recommendation in pertinent part and denying the motion to dismiss). Instead, Plaintiff claim is that Dr. Carrero consciously chose not to properly reschedule Plaintiff's

surgery and not to provide pain medication, unrelated to medical treatment, because she was angry that he cancelled his original surgery. Thus, in the Court's view Dr. Carrero's alleged wrongful act was not directly related to the use of professional judgment or skill. *See Reeves v. N. Broward Hosp. Dist.*, 821 So. 2d 319, 322 (Fla. 4th DCA 2002) (to be deemed a medical malpractice action, "[t]he alleged wrongful act must be directly related to the improper application of medical services to the patient *and* the use of professional judgment or skill") (emphasis added); *Ashe*, 948 So. 2d at 891 (determining plaintiff's claim to be one of ordinary negligence, not medical negligence, where hospital employee defendant released plaintiff's daughter from hospital in violation of mandatory and non-discretionary requirements of Florida's Baker Act). Instead, as Plaintiff alleges, Dr. Carrero's delay in providing medical treatment was related to her animosity towards Plaintiff and compliance—or lack thereof—with the FDOC's policies regarding scheduling and rescheduling of surgeries.  Thus, as the Court previously concluded, Plaintiff's claim is properly construed as an ordinary negligence claim. *See Liles*, 681 So. 2d at 712 (concluding that where the issue is proper compliance with a statute, the action is founded in ordinary negligence because compliance does not require medical skill or judgment).

Because Plaintiff's claim against Dr. Carrero is not a medical negligence claim, his claim is not barred by the two-year statute of limitations. Nor was Plaintiff required to comply with the pre-suit requirements in Chapter 766, which mandate that prior to filing a medical malpractice action the plaintiff must provide each defendant via certified mail, returned receipt, with a notice of intent to initiate litigation for medical malpractice, a medical release, and a verified written medical expert opinion. *See* Fla. Stat. §§ 766.106, 766.1065, 766.203(2); *Joseph*, 71 So. 3d at 917.

### 4.    *Plaintiff has failed to establish that Defendants were negligent.*

Defendants argue that Plaintiff has failed to demonstrate that any of the Defendants were negligent. To prevail on a cause of action for negligence under Florida law, the plaintiff must prove four elements: (1) defendant owed a legal duty to plaintiff; (2) defendant breached that duty; (3) defendant's breach caused an injury to plaintiff; and (4) damages as a result of that injury. *Janis v. Pratt & Whitney Canada, Inc.*, 370 F. Supp. 2d 1226, 1229 (M.D. Fla. 2005); *Gibbs v. Hernandez*, 810 So. 2d 1034, 1036 (Fla. 4th DCA 2002); *Paterson v. Deeb*, 472 So. 2d 1210, 1214 (Fla. 1st DCA 1985).

### a.   Defendants West and Wolf

Count six alleges Defendant West contributed to the delay in medical treatment and refused to follow the policy that medical grievances be reviewed by a Chief Medical Officer, thereby causing Plaintiff pain and mental anguish. Similarly, in count seven Plaintiff asserts that Defendant Wolf was negligent because she failed to advise supervisors that Plaintiff's surgery was not being scheduled, thereby causing Plaintiff injury. As discussed previously, Plaintiff cannot recover against Defendants West or Wolf in their individual capacities for negligence. Instead, the cause of action must be asserted against their employer—the FDOC.[11] Plaintiff's negligence claims against Defendants West and Wolf must, therefore, be considered on the theory of vicarious liability.

Vicarious liability is not based on the negligence of the employer, but rather the negligence of the employee imputed to the employer. *Am. Home Assurance Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 468 (Fla. 2005). The employer can be held liable when an employee's acts "were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer." *Nazareth v.*

---

[11] It is undisputed that Defendants West and Wolf were employed by the FDOC at all relevant times. (West Dec. ¶¶ 2–3; Wolf Dec. ¶ 2.)

*Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. 5th DCA 1985). The plaintiff must nonetheless still prove some wrongful or negligent act by the employee to attach liability to the employer. *See Sutton v. Fla. Dep't of Corrections*, No. 05-61712-CIV-COHN/SNOW, 2007 WL 1068129, at *2 (S.D. Fla. Apr. 4, 2007).

Turning first to Defendant West, the undisputed evidence demonstrates that—at best—the only duties Defendant West owed Plaintiff were to (1) ensure the proper routing and filing of Plaintiff's two grievances to the Medical Department for a response, and (2) distribute the response to Plaintiff and the Department's record keeping system. (West. Aff. ¶ 3.) Plaintiff has offered no evidence suggesting that Defendant West owed any other duty to Plaintiff.

Plaintiff has offered no evidence suggesting that Defendant West breached a duty to Plaintiff. Instead, both grievance responses are signed by Defendant West, as well as Dr. Carrero. This shows that Defendant West did indeed ensure that Plaintiff's medical grievances were routed to the Medical Department for a response. Furthermore, Plaintiff has not asserted that he did not receive responses to both grievances. Nor has Plaintiff submitted any evidence suggesting that the responses were not distributed to the Department's record keeping system. The mere fact that

copies of these responses were produced in this matter evidences that the responses were properly distributed for record keeping purposes.

Moreover, even if Defendant West had breached some type of duty (which he did not) there is no evidence suggesting that Plaintiff suffered any injury or damages related to the grievance process. Plaintiff's grievances complained about his surgery not being scheduled and not receiving pain medication. But, Plaintiff already was scheduled for consultation with Dr. Esquivia when he filed his October 12, 2010 grievance, and Plaintiff had been provided ibuprofen for pain. Similarly, Plaintiff's surgery was in the process of being rescheduled when he filed his January 25, 2011 grievance, and Plaintiff received ibuprofen and Naprosyn for pain and inflammation. Plaintiff also could have presented to sick call to inquire about his surgery or to seek pain medication if desired. In short, there is no evidence suggesting that Plaintiff could have suffered any injuries or damages even if Defendant West had somehow breached his duty with respect to the grievance process.

Likewise, with respect to Defendant Wolf, Plaintiff has offered no evidence demonstrating that Defendant Wolf was required to advise supervisors about anything. Nor has Plaintiff provided any evidence that his surgery was not in the process of being rescheduled after it was

cancelled due to his latex allergy. Instead, the evidence demonstrates that the only duties—if any—Defendant Wolf owed to Plaintiff were (1) to respond to Plaintiff's medical grievance by reviewing Plaintiff's chart and any other relevant records, (2) discuss the issue with a medical provider if necessary, and (3) respond to the grievance. (Wolf Dec. ¶ 3.) Defendant Wolf responded to Plaintiff's grievance on February 15, 2011. (*Id.* ¶ 4.)

Defendant Wolf reviewed Plaintiff's records, which disclosed that Plaintiff was in the process of being rescheduled for surgery. (*Id.*) She also informed Plaintiff that if he was in pain he needed to report to sick call. (*Id.*) Dr. Carrero signed Defendant Wolf's response, evidencing that Dr. Carrero reviewed the response. (Compl. at 6.) Thus, nothing suggests that Defendant Wolf did not perform her duties as required.

Moreover, there is no evidence that Plaintiff's surgery was not being rescheduled as Defendant Wolf noted in her response. The records show that twenty days after Defendant Wolf responded, Plaintiff was called to medical to discuss the possible latex allergy. (MR at 28.) After it was determined Plaintiff did not have an allergy, he returned to RMC for surgery on March 23, 2011. (*Id.* at 25–27.) This delay was normal, as it can take three to four months to schedule routine surgery. (Maier Dec. ¶ 15.)

The undisputed evidence, therefore, shows that Defendant Wolf did

not breach a duty owed to Plaintiff. And even if Defendant Wolf had breached her duty, there is no evidence to support Plaintiff's claim that he suffered injury or damages from such.

Based on these undisputed facts, no reasonable jury could conclude that Defendant West or Defendant Wolf were negligent. Plaintiff's negligence claims in counts six and seven fail as a matter of law. Consequently, because neither West nor Wolf were negligent, the FDOC cannot be vicariously liable.

### b.    Dr. Carrero

In count five, Plaintiff alleges Defendant Carrero failed to ensure timely medical treatment and failed to provide pain and anti-inflammatory medication for Plaintiff, thereby causing Plaintiff pain, injury, and mental anguish. To prove that Dr. Carrero was negligent Plaintiff needs to show that Dr. Carrero breached her duty to provide adequate medical care to Plaintiff. But other than pointing to alleged delay, he has offered nothing demonstrating that she did so. To the extent that there was a delay, the evidence demonstrates the delay was a result of two things. First, Plaintiff elected to cancel his surgery, which then required Plaintiff—according to policy—to go through the process again. Second, another doctor at another institution determined Plaintiff might have a latex allergy. There is

no evidence suggesting that Dr. Carrero had anything to do with either reason.

It is undisputed that when an elective surgery is cancelled the patient must reinitiate the process, which includes reporting to sick call three times, being examined by the institution's doctor, referral to a specialist, and obtaining a surgery request from the specialist. Despite Plaintiff's assertions that this was not the proper policy because his surgery was not an elective surgery, there is no evidence in the record to support Plaintiff's contention. To the extent Plaintiff relies on Dr. Esquivia's notation of "urgent" on the consultation report and that Dr. Carrero's surgery request form noted "urgent," this does not mean a different policy was to be applied.  Plaintiff has provided no evidence that the FDOC has a different policy for various types of elective surgeries. Instead, the evidence shows that Plaintiff's meniscus tear was not a medical or surgical *emergency* and could be handled conservatively without *immediate* surgical intervention. (Maier Dec. ¶ 3.) And, as the FDOC's surgical request form demonstrates, there is a difference between an urgent surgery and an emergent surgery. (MR at 66.)

There is also no evidence demonstrating that Dr. Carrero had anything to do with the alleged delays. Approximately a month and a half

passed between the time Dr. Carrero submitted the first consultation

request and the first surgery date. Plaintiff does not contest that this was a

reasonable length of time. Then, approximately two and a half months

passed between the time Dr. Carrero submitted the second consultation

request and the second surgery date. Plaintiff, however, takes issue with

this delay. The evidence shows that the additional month during the

second waiting period was largely due to the fact that Plaintiff did not see

Dr. Esquivia until approximately one month after Dr. Carrero submitted the

second consultation request compared to the initial 11 day-waiting period.

There is no evidence, however, that Dr. Carrero had anything to do with

this delay. Nor is there any evidence demonstrating that Dr. Carrero had

anything to do with scheduling the appointments other than submitting the

request. On the other hand, the evidence shows that a three to four month

waiting period for routine surgery is normal.

Plaintiff also says that after he cancelled his first surgery an

unnamed nurse told Plaintiff that Dr. Carrero was angry. Plaintiff suggests

that this evidences Dr. Carrero intentionally delayed the surgery.  While it

does not, even if it did suggest this, Plaintiff's statement that an unnamed

nurse told him this is inadmissible hearsay. In contrast, Dr. Carrero has

submitted a sworn declaration averring that she did not deliberately delay

rescheduling Plaintiff's knee surgery to punish Plaintiff for refusing his scheduled surgery. (Carrero Dec. at 1.)  And even if the unnamed nurse's statements were admissible, the undisputed evidence shows that regardless of whether Dr. Carrero was angry at Plaintiff, he nonetheless was required to reinitiate the process by reporting to sick call three times before seeing Dr. Carrero.

After Plaintiff completed the process the second time, his surgery was cancelled due to medical necessity. Dr. Carrero did not cancel the surgery, nor is there any evidence that she was involved in the cancellation. While Plaintiff claims surgeries are often cancelled as punishment, Plaintiff has provided no evidence to support this claim. Plaintiff's medical records show that his surgery was cancelled due to a suspected latex allergy.  Cancelling an elective surgery, such as Plaintiff's, due to a suspected latex allergy is not uncommon. (Maier Dec. ¶ 17.)  And even though Plaintiff does not recall being tested for a latex allergy and it was later determined that he did not have a latex allergy, there is evidence that Plaintiff had psoriasis, which can be mistaken as a latex allergy. (*Id.*)

Two days after Plaintiff returned to Cross City CI following the medically cancelled second surgery, Dr. Carrero reviewed his record. The next day, the nurse told Plaintiff that his surgery was in the process of

being rescheduled. Plaintiff was called to medical to discuss the possible allergy on March 7, 2011. Plaintiff underwent the knee surgery on March 23, 2011, only a couple of weeks later. Nothing suggests that Dr. Carrero somehow delayed this process, nor is there any evidence that the surgery was not in the process of being rescheduled as the nurse informed Plaintiff.

To the extent that Plaintiff claims Dr. Carrero breached her duty by denying him pain medication, the evidence wholly refutes Plaintiff's claim. Plaintiff consistently received ibuprofen for pain and, when requested, prescriptions for Naprosyn. According to the medical records, any time Plaintiff requested Naprosyn, it was prescribed. Plaintiff could have reported to sick call to request a refill but there is no evidence that he did so. Moreover, even if he had been denied Naprosyn, which he was not, the evidence demonstrates that he was receiving ibuprofen, which is a similar pain medication and also is used to treat inflammation. (Maier Dec. ¶ 16.) In sum, there is no evidence demonstrating that Dr. Carrero breached her duty to provide adequate medical care to Plaintiff.

Lastly, even assuming, *arguendo*, Dr. Carrero had somehow breached her duty by contributing to the delay or failed to provide appropriate pain medication, the undisputed evidence demonstrates that

Plaintiff did not suffer any injury from the delay or medication. Dr. Maier avers that in his professional opinion based upon Plaintiff's medical records, Plaintiff suffered no further injury or exacerbation of his existing injury from any delay. (Maier Dec. ¶ 18.)

Moreover, Dr. Esquivia's findings on the second consultation were no different from the first.  And to the extent Plaintiff alleges that ongoing pain and inflammation were his injuries, not only did Plaintiff continue receiving various medications to treat the conditions, he suffered the same pain and inflammation before the delay. Because there is no evidence of causation and no evidence of any injury Plaintiff cannot sustain a negligence claim against Dr. Carrero. *See Saunders v. Lischkoff*, 137 Fla. 826, 834 (Fla. 1939) ("If there is no injury caused by lack of skill or care, then there is no breach of the physician's obligation, and there can be no recovery.").

Accordingly, the undisputed evidence demonstrates that Plaintiff's negligence claim against Dr. Carrero fails as a matter of law.

### c.    FDOC

Count four alleges that Defendant FDOC failed to enforce policies, failed to ensure that Plaintiff timely received surgery, and failed to conduct an adequate investigation into Plaintiff's complaints about surgery and pain medication because the FDOC merely accepted the institutional responses

as adequate and told Plaintiff to use the sick call procedure.

Despite Plaintiff's conclusory allegations that the FDOC failed to enforce policies and that his surgery should have been scheduled in a more timely manner, he has provided no evidence demonstrating that there was any other policy the FDOC should have followed with respect to his surgery. As discussed above, the FDOC followed the one policy applicable to scheduling surgeries. To the extent Plaintiff relies on his allegations that Defendants West and Wolf should have somehow stepped in and expedited the process, the evidence wholly refutes these allegations.

Although Plaintiff began complaining of knee pain in 2007 and continued doing so through 2010, the evidence also does not support a negligence claim against the FDOC on that basis. Even if the FDOC should have ordered x-rays sooner, there is no evidence that the failure to do so caused any further injury. Moreover, any claim premised on the argument that the FDOC should have treated Plaintiff when he was initially injured in 2007 would be barred by the four-year statute of limitations.

Finally, Plaintiff has provided no evidence that the responses to his grievances were not adequate. Defendant West and Defendant Wolf have both testified that they responded to Plaintiff's grievances as required and in accordance with policy. The fact that Plaintiff may not like how the FDOC

responds to grievances does not support his claim that the FDOC was negligent. The undisputed evidence demonstrates that the FDOC is entitled to judgment as a matter of law on Plaintiff's negligence claim both against the FDOC and against Defendants Dr. Carrero, West, and Wolf in their official capacities.

## V.  RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that:

Defendants' Motion for Summary Judgment, ECF No. 105, should be **GRANTED.**

**IN CHAMBERS** this 21st day of October, 2016.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**